and Petrochemicals Sales. Rodrigo S. Da Silva is here for the appellate Comparelli. Sally Pei is here for the Republic of Cuba, I'm sorry, Venezuela. And Claire Dallal is here for Petrochemicals Sales. And Mr. Da Silva, you may begin your argument. Good morning, Your Honors. May it please the Court. My name is Rodrigo Da Silva, and for the past decade, it has been the greatest privilege of my legal career to represent the appellant Carmina R. Comparelli, who is the plaintiff below, who is sitting here in the courtroom. We ask this Court to reverse the grant of the motion to dismiss for lack of subject matter jurisdiction and for failure to state a cause of action, because the plaintiff has plausibly pled and provided circumstantial and direct evidence that immediately establishes that the criminal case used as a pretext to expropriate my client's company was a sham or a pretext to expropriate Maribel Garcia. So you have to show that there's no public purpose for the seizure of her property, right? Correct. And so in order to do that, we need to look in the record to see whether there's any evidence that this was a sham criminal proceeding. So where do we go in the record for evidence that the seizure of her property was a sham criminal proceeding? Okay. There are a few pieces of evidence. The most significant, I think, is the decision of a Costa Rican court that reversed a trial court's decision to extradite the appellant's son. He was a director of the company. It's a family business, mother and three sons. They all got involved in the same case, the same two charges, drug trafficking and criminal conspiracy. And what the appellate court in Costa Rica found is what we learned, everybody learns in the first semester of law school, that many crimes require a main threat. You have to have a specific intent. The crime of excessive storage of hydrochloric acid, that's not a crime. The crime that she was charged and that kids were investigated for. The specific law says the possession of a controlled substance would be a specific intent to either distribute or manufacture illegal narcotics or other psychotropic substances. The second charge is criminal conspiracy. So what the Costa Rican court did, looking at all the criminal records as part of the extradition request, what they found is that the only fact is that they had excess hydrochloric acid. The Costa Rican court said that's not enough, either under Venezuelan law or under Costa Rican law, because there is no evidence in the file that the so-called excess was used for an indecent purpose. I have this bottle here that has acetone. I bought that legally. Even if I have a full warehouse of those bottles, I'm not a drug trafficker. I'm only a drug trafficker if I use that substance, which is just like hydrochloric acid, to either manufacture or distribute narcotics. The Costa Rican court found that because there was no underlying criminal drug trafficking crime, the criminal conspiracy case must also fail. Did the court find that there was no underlying crime or that Venezuela had not provided enough evidence to satisfy extradition requirements for that crime? They found that there was no evidence for the crime itself to meet the elements of the crime, that the specific intent to either manufacture or distribute illegal narcotics was not there, and that because criminal conspiracy requires an underlying crime, that charge also fails. And they found that under Venezuelan law, correct? I'm sorry? They found that under Venezuelan law. Under Venezuelan law, and also they also applied Costa Rican law because of the criminality requirements. There is another great piece of evidence because it's direct or circumstantial evidence. The appellant obtained lawful permanent residence status in the United States. I'm an immigration attorney. I represent clients in immigration proceedings all the time. There is a federal statute under the Immigration Nationality Act that if an individual is suspected, near suspicion, not arrested, not charged, not convicted, near suspicion that an individual is involved in a drug conspiracy or his wife or his kids or any close to them, they cannot get any immigration benefits. It's a total ban. They are inadmissible. And the appellant testifies of the position, she's a lawful permanent resident. Her son who is sitting there is a U.S. citizen. He was first then he applied for lawful permanent resident. Then he became a citizen and then he petitioned for the appellant lawful permanent resident status. Throughout that process, the FBI and all the Homeland Security took a look at these charges and they passed judgment because otherwise they would not be here. We also have the statements of President Chavez, which we attach a transcript to the record. He went on national television and in the same sentence, he stated, great, we took these four companies because they took seven companies. Suddenly all the companies that provided services to Pekíven, which is the state owned petrochemical company, seven companies, including the appellants, suddenly all of the owners are drug traffickers and suddenly all of those companies are taken and suddenly all of those companies become property of Pekíven. And in that televised address, President Chavez said the fight against drug trafficking and the strengthening of the socialist economy. In the same sentence, the second circuit in the Biden-Walters decision stated that sometimes it's very hard to prove that a criminal case is a sham, but there might be statements from foreign officials that show the ulterior motive. A judge did not transfer the companies to Pekíven, the criminal judge. It was the president himself. We also need to take a look at that some of the government officials that are involved here. He was the minister of justice that sought President Chavez's approval to transfer the companies to Pekíven. Mr. El-Sami is on the ICE most wanted list for allegedly conspiring to bring over a thousand kilograms of cocaine to the United States. He's indicted in the Southern District of New York on eight felonies, including conspiracy for money laundering and violations of the Kingpin Act. He has been designated under the Kingpin Act as a narcotics international trafficker. Mr. Rivero, he was the head of the National Anti-Drug Office, the equivalent of the DEA. He held that position when my client's company was seized in a pre-conviction of forfeiture. I want to make sure I understand. The record reflects that criminal charges were filed against the owners of all of these companies, the seven companies? Correct. None of them have been tried today, 14 years later, because the police will make the case that she cannot be tried because she's an absentia. 14 years later, there has not been a criminal conviction in any of those cases. 14 years later, the company doesn't exist as a going concern. They had to keep the company under the receivership order, under the pre-conviction order in the same status quo, because if the person ultimately found innocent, the property needs to be returned. Now, that company, we have evidence in the record, is now being used by another ministry to stockpile food that they give to poor people. So they haven't even complied with their own directive. There is also evidence in the record, there is a PowerPoint from an official from Pekivan, that states that this is a great company, we can sell the company. How can you sell the company that you have temporary receivership, and if the person is ultimately found innocent, you need to return? That's very strong evidence of the expropriatory intent. Moreover, even the excess storage, they allege 1.3 million of hydrochloric acid, there was an audit conducted after they took possession of the company, and in that audit, it was reflected that it was only 410 kilograms, which was within margin tolerance when you buy products in bulk. And again, the excess storage is only a red herring. That's not a crime, the crime is the possession of a controlled substance to manufacture or distribute narcotics. It is undisputed here that she had all the government permits to have this chemical. It is undisputed that she bought the chemicals from Pekivan, who has a monopoly on hydrochloric acid. And it's also undisputed that when she bought the product from Pekivan, it was only to distribute it to other state actors that were pre-approved by Pekivan. Every time she had purchase orders, she had to tell them, send these to these other state-owned actors. But it's even a letter from Pekivan in the file that states that Maribelka was a great partner of Pekivan, and they always complied with the needs to distribute the product to other state actors. And counsel, this is all in the record? It is all in the record, Your Honor. Okay, well, let me ask you this question. If Justice Aponte was permitted to, you know, testify or whatever, what would he have said? Do we know from the record what he would have said? He's the smoking gun witness in this case. He was chief of the criminal chamber of the Venezuelan Supreme Court. He has given multiple interviews and file affidavits in multiple cases because he sent many people to jail and he has regretted that. We have quoted articles from him where he has basically stated that justice in Venezuela was like a ball of pudding. He got massaged at the executive and that he personally, every Friday, received calls from then-President Chavez telling him how to decide cases. He was three hours away from here. We subpoenaed him to take his deposition and the judge blocked it under the common law, foreign official immunity. It has nothing to do. We were not bringing Mr. Aponte here as a defendant, bringing claims against him. It defies common sense that under the Foreign Sovereign Immunity Act, government officials, by definition, they have an expiration date unless you're a dictator. Many times, with the passage of time, former officials are going to have personal knowledge of the facts. And it would defy a lot of common sense that you can strip a foreign sovereign of immunity and then you cannot get your witnesses to prosecute that case. Well, I had a question I was going to ask the other side, but maybe you know. I understand that at some point, counsel for the Venezuelans were substituted for Guaido. Who is representing them? Are they representing Maduro now or are they representing still Guaido? My understanding is that the interim presidency of Guaido was dissolved and that the only democratically elected sector of the government, which is the Congress, has appointed a committee to deal with assets abroad and that they represent members of that committee. But it would be part of the Guaido so-called government, but a different group of people that are associated with Congress, legislators. And the jurisdictional discovery, we didn't get almost no jurisdictional discovery. They produced a 36 witnesses that have no personal knowledge. They couldn't even give us a copy of the criminal file. And your honor, the client is the Republic, is Peke Ven. The client is not the representatives of the Republic. The Republic is only one. Peke Ven is only one. They came into this case voluntarily to remove the lawyers for the Maduro regime who had access to the documents. There is no evidence, even in the record, that they called the Maduro officials to request the documents. They can have talks about transition of power, about elections, but they couldn't have, there is no evidence that they even say, can you please give us the documents? We are defending the Republic abroad that we need these documents. Can you please provide it to them? And on that record, we were completely, we really got really rough justice here. We couldn't depose our smoking gun witness. The court completely disregarded the Costa Rican decision, which is very, very strong and very well reasoned. She did not make any mention of the immigration law issue that clearly provides circumstantial evidence that the U.S. government, the executive branch have passed judgment on these proceedings. She did not address at all the uncontroverted expert opinion report that not only talk about the status of the judiciary in Venezuela, but also about the irregularities with this case itself, the warrantless searches, and the fact that this should have been an administrative violation at most. Before you finish, I have one follow-up question regarding Justice DuPonte. Didn't the United States here submit a statement of interest that, or I guess in a different case, that a foreign official is immune from testifying to the extent that plaintiff sought information relating to acts taken in his official capacity as a government official? Not in this case. Not in this case, but if that's been the United States' position as a general matter, why wouldn't that apply, why wouldn't that principle apply here? That was not an FSA case. That's right. That was not an FSA case. So Justice DuPonte is not a party to the case, is that right? Yes. So. Exactly, that's another reason. I know my time is up. I don't know if the court has any other questions. Okay, all right. Thank you, Mr. DeSilva. Okay. Thank you. Good afternoon, Your Honors. May it please the Court. Sally Pei from Arnold and Porter on behalf of the Bolivarian Republic of Venezuela, as recognized by the United States, formerly led by Interim President Juan Guaido, and now by the President of the National Assembly. So you're representing now the Maduro regime? No, that's not correct, Your Honor. We're representing the legitimate representatives of Venezuela, which are the 2015 National Assembly, as led by the President of that body. So we are not here representing the Maduro regime. Okay. In fact, when our firm was retained by the recognized government of Venezuela in this case, we had no preconceived notions about the facts or whether these plaintiffs had legitimate claims for relief. And part of our task was to discern what the position of the recognized government should be, because the Republic condemns the abuses perpetrated by the Maduro and Chavez regime. And in cases where plaintiffs have actually demonstrated that they have valid claims to compensation arising from, for example, expropriations carried out by, under former President Chavez, the Republic has consented to entry of judgment. But as the factual record in this case demonstrates, this is not one of those cases. The district court correctly dismissed for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act, and this court should affirm for three main reasons. First, the court correctly followed the Supreme Court's guidance in Helmarich and this court's mandate and required the plaintiff to show that there was a taking of property in violation of international law. Second, the plaintiff failed to show that the criminal proceeding pursuant to which Mayra Velka was temporarily seized was a sham. And third, none of the district court's discovery rulings, including its decision to quash the subpoena issued to Justice Aponte on grounds of foreign official immunity, was an abuse of discretion. So turning first to the framework, as this court recognized in its 2018 decision, the Supreme Court made clear in Helmarich that in order to establish jurisdiction under the Foreign Sovereign Immunities Act, the plaintiff had to show that her claim arose from a taking of property in violation of international law. And I think it's common ground here that really what the issue boils down to in this case is whether the plaintiff has put forward evidence that the legal proceeding pursuant to which Mayra Velka was temporarily seized was a sham. And the record simply doesn't support the plaintiff's theory. How does it not support the theory that plaintiff is espousing when you have the Costa Rican judgment finding that there was no evidence of a crime or a criminal conspiracy? So I'd like to address the Costa Rican court decision. Those, as Judge Grant noted, were about the extradition request. And so the courts in Costa Rica were applying the standards to consider whether extradition was appropriate. They were not determining whether there was evidence to convict Freddie Camporelli, who's not the plaintiff in this case, of any crime. The question was simply whether the documents that had been presented by the Venezuelan authorities showed that the conduct of which Freddie was accused was a crime under both Costa Rican and Venezuelan law. And so if you look at, for example, Page... But if they found that they believed that it did meet the elements, then he would have been extradited, correct? He was not extradited. He was not extradited because the Costa Rican courts could not determine from the face of the documents presented by Venezuela that exactly what conduct Freddie had been accused of, and whether that conduct actually constituted a crime under Costa Rican or Venezuelan law. They were specifically not making a judgment as to whether... So that sort of begs the question, if you have Justice Aponte testify under oath and he would testify, I'm assuming the factual proffer would be that, in fact, that was a sham proceeding, a sham criminal proceeding that was done for purposes of expropriating unlawfully the company of the individuals in question, doesn't that beg the question of why Justice Aponte shouldn't have been deposed? So with respect to Justice Aponte, there's no evidence in the record about what he would have testified in this particular case. The plaintiff never submitted a proffer of what testimony he would have given. You know, there are, for example, attachments to their complaints where he has made statements about other cases in which he was involved, but there's nothing indicating what he would have said with respect to these particular plaintiffs. And I think that's a really important point to underscore. Well, we do know that after the company was expropriated, that I think that then at the time it was not Maduro, it was Chavez commented towards socialism, correct? So first of all, the company has not been expropriated. It is under a temporary supervision. Well, it's not owned by the original owners, correct? In my definition, that's expropriated, but it's not a question. You may move on. So, okay. So it has not been expropriated. It's under temporary seizure. And well, yes, President Chavez has written a statement towards socialism, but I don't think that demonstrates that the underlying criminal proceeding pursuant to which the property was temporarily seized for law enforcement purposes was a sham. And isn't there evidence that the hydrochloric that was actually purchased from the government itself? Yes, but the plaintiff has conceded both in the Venezuelan criminal proceedings and in this case that Mara Velko was storing hydrochloric acid in excess of the amount that was permitted to handle. And the district court's finding that the storage of excess hydrochloric acid is a legitimate reason for law enforcement seizure of Mara Velko is not clearly erroneous. I think particularly given that the claimant herself has, as I said, admitted that there was an excess. She has never explained, offered a satisfactory explanation as to why the 1.3 million kilogram finding by the Venezuelan authorities was wrong. The audit report to which the plaintiff refers is a report produced by the plaintiff and her counsel themselves, submitted several months or perhaps a year after the original investigation, not accompanied by any corroborating documentation. So the district court, again, did not clearly err in finding that the storage of... Let me go back to Justice DuPonte because I heard Mr. De Silva say earlier that Justice DuPonte is the smoking gun. And his testimony could establish that the seizure was a sham criminal proceeding. His deposition was quashed. And so I heard you say that there was no proffer about what Justice DuPonte would say, but that's not why the district court quashed the subpoena. The district court quashed the subpoena based on procedural grounds, just based on his... There's only jurisdiction over individuals of foreign sovereigns pursuant to Sementar versus Rousset. But DuPonte is not a party to the case. He's just a witness. So Sementar would not apply. So why... I mean, it seems to me that the court applied the wrong law in quashing the subpoena of Justice DuPonte. And if the court applied the wrong law, then that would constitute an abuse of discretion. So I disagree, Your Honor, that the court applied the wrong law. The law that the court was applying to quash the subpoena of Justice DuPonte was the common law of foreign official immunity. There's no dispute that Justice DuPonte is a former official of Venezuela. And the federal courts have made clear that the immunity that attaches to former officials, that prevents them from testifying about acts committed or information gained during their performance of official duties, that is really an immunity that flows from the sovereign. And the sovereign has standing to raise that immunity. So you can look at, for example, the Giraldo versus Drummond case and Wolf versus Bank of China, in which the court prevented or either denied a motion to compel testimony, or in the Wolf's case, quashed a subpoena for testimony of a former official who was not a party to the case. And there's no basis for this notion that the plaintiff seems to be advancing that the Foreign Sovereign Immunities Act, for some reason, provides an exception to these well-established principles of common law immunity. Why isn't there a pretty strong inference to be made that these proceedings were a sham based on the fact that somehow all seven of the companies were allegedly involved in this drug trafficking or drug production activity at the same time that the government wished to take over these companies? So again, I think that the standard that the court was applying, and rightly so, may I finish my answer to the question? The standard that the court was applying was whether there was clear and specific evidence of impropriety in the particular case here. And so I think that the notion that there were other companies under investigation at the same time doesn't bear on whether this particular prosecution was a sham. As I noted, there's evidence about the amount of hydrochloric acid that the plaintiff conceded that the amounts were in excess. There's been no evidence presented in this case from the criminal proceedings themselves. The plaintiff didn't present any testimony from her own criminal lawyers about any impropriety in this particular case, and she admitted at her deposition that she was not aware and her lawyers had never represented to her that there was any kind of corruption, bribery, misconduct by the judges in her case. But there's not been a conviction, right? That's correct. There's not been a conviction, and in Ms. Comparelli's case, that's because, I think as the plaintiff noted in his argument, she has left Venezuela and proceedings cannot continue in absentia. So it's been suspended because she is no longer in the country. You know, it's quite possible that, we hope as well, that conditions in Venezuela will change, and at some point in the future she will be able to return and the criminal proceedings can resume and she can defend herself in that criminal process. And if she prevails, then she is entitled to claim the return of her property and any damages. Does the company still exist? As far as I am aware, as far as the record reflects, yes, it exists. It is being managed by another ministry consistent with Venezuelan law. Were you, I'm sorry, was Comparelli able to depose any other Venezuelan officials under Rule 30b-6? Yes, we presented a 30b-6 witness for deposition, and the plaintiff took her deposition. Actually, I have a follow-up question. What of the comment from your friend on the other side that no one has asked the Maduro regime to produce these documents and answer these questions? So I think as you will see from the declaration that Mr. Aguilar presented in the district court, that's at docket entry 231-1, I think, he explains there the reasons why jurisdictional discovery was extremely difficult in this case and the risk of personal harm that would have come to personnel from his office if they were to identify themselves as being associated with the Guaido administration seeking documents from the Maduro regime. So it's quite clearly set forth there, and the magistrate judge in the district court found that compelling. Thank you. Thank you. Thank you, counsel. Mr. Lowe, on behalf of International Petrochemical Sales. Thank you. Good afternoon. May it please the court. Claire Dallal for the Apoiee Petrochemical de Venezuela, also known as PECAVEN. The district court correctly held that plaintiff's evidence failed to satisfy the narrow circumstances recognized in cases such as Bayer-Walters for the establishing jurisdiction based on temporary law enforcement seizures. As the district court correctly found, plaintiff failed to elicit clear or specific evidence that the criminal investigation and preventative seizure lacked a public purpose. It was plaintiff's burden under Helmrich to establish a taking in violation of international law, and she failed to do so. Plaintiff's evidence as to PECAVEN in particular highlights only evidence that serves the legitimate purpose of regulating controlled chemicals in Venezuela, and the record shows that PECAVEN's involvement began in November 2010. That's two years after the criminal investigation began, and followed by well-documented judicial process from the Zulia courts,  Lorinda, let me ask you, what exactly would a plaintiff like Camporelli have to show in your opinion to meet her burden? She would have to show that this was a sham proceeding. What would she have to show? I'm asking you because that means nothing to me. According to the guidance from the Second Circuit, I think the Second Circuit and Bayer-Walters has expounded in most detailed fashion than other cases that there were ulterior motives that strongly suggested, and in fact did show that there was a scheme or a desire to expropriate the property, or nationalized property. There is no such evidence in this case. There has only been speculation, and in fact, if we look at... DeFonte testified under oath that in fact, this was the modus operandi of the Venezuelan government to create sham criminal proceedings against all business interests, whether it was the Best Buy of Venezuela, or companies such as Ms. Camporelli's company, to expropriate their companies. In order to do so, they created criminal sham proceedings against them. If he testified to that, would that not be sufficient? Justice DeFonte would have to testify as to clear and specific evidence that the particular proceedings concerning Mara Velka were in fact a sham. There is no evidence in the record. There's no proffer as Ms. Paye has already informed the court as to what Justice DeFonte would have testified to. Now, Justice DeFonte did feel the need to... Is there anyone in the court that considered some of these issues in Venezuela? Justice DeFonte himself? That is correct. Well, it seems like he's uniquely qualified to offer some sort of information about whether or not the proceedings were sham criminal proceedings. He was on the cases himself, right? So Justice DeFonte felt the need to unburden his conscience, as he put it, in respect of different cases. There is nothing in the record. There is no evidence that he has any view whatsoever about this particular case. There's no evidence in the record because the subpoena would quash, correct? That is correct. It's difficult to have evidence when the subpoena is quashed. There was nothing preventing plaintiffs from coming forward with a declaration, a proffer, anything of that nature, but they did not do that. But I would also venture to suggest that the scope of jurisdictional discovery did not reach and should not have reached those issues. There was insufficient factual allegations, even in the amended complaint. If you look at the amended complaint, the allegations are generalized statements about the Chavez regime and then purported defenses from a domestic law. I mean, I don't even know that we get to that because here, the district court found that there was no subject matter jurisdiction, right? That's the first issue. Based on plaintiff's own evidence attached to their amended complaint, it showed nothing but the district court found no subject matter jurisdiction based on the fact that there was no violation of international law, but there's no violation of international law because there was no discovery that was permitted in order to meet, to be able to satisfy that evidentiary purpose, because this is a strange case because it's not like a 12B6 where you only rely on the complaint. Under this procedural posture, there has to be the district court can consider evidence, but when you don't allow evidence to proceed, it's very difficult to have a plaintiff be able to meet their burden then. So the evidence, the jurisdictional discovery that did take place was actually a lot more extensive than perhaps is evident at first blush. Peckovan, for example, produced over 15, almost 1500 pages worth of documents and to recall from the record, but they're not trying to have evidence of a violation of international law. If there were any evidence that these were sham proceedings, that would have been produced and there was none. If I may respond to a couple of points that Mr. De Silva, made regarding some of that evidence. He contended that a May 2010 letter that Peckovan's sales manager sent stated that Maravelka always complied with its permits, but that's not what the letter says at all. The letter is a very short letter at 85-11 and it states only that Peckovan asked Maravelka about the possibility of Maravelka meeting its contingency plans in accordance with the CICPC permit. It said nothing about what the contingency plans for HTL were, none of the quantities were mentioned, or even whether that contingency plan that was anticipated would meet the existing CICPC permit that Maravelka had or whether indeed Maravelka would need any permit. All right. Thank you. We have your argument. Thank you, Mr. Low. Mr. De Silva, you've reserved some time for rebuttal. Your Honor, the most important topic to decide this case is that there is a burden shifting that occurs in an FSIA case. The plaintiff first needs to put an initial burden of production that the exception applies. We think we met that with direct and circumstantial evidence that this criminal proceeding is a sham. Having met that burden, the ultimate burden of persuasion was shown between these courts' jurisprudence in Beven-Guechea versus Venezuela. The ultimate burden of persuasion rests with them to establish that the exception does not apply. Judge Williams put the burden on us all the way from beginning to end and she didn't even consider many of the key pieces of evidence. So having the appellant put the initial burden, it shifts to them the ultimate burden of persuasion. And if they cannot prove that the criminal proceeding is legitimate, we should prevail. And there is nothing here else to decide other than damages because this is a unique case. What we need to prove to establish subject matter jurisdiction is an unlawful expropriation. What we need to prove to win on the merits is an unlawful expropriation as this court recognized in the 2016 decision. I wanted to also comment in another piece of evidence. Venezuela requested red notices to arrest the appellant's children worldwide. Julio, who's sitting here and used to be a plaintiff in this case, challenged that red notice and produced some of the evidence that I submissioned in this case. And what Interpol did is, he reached out to Interpol Venezuela and said, give me evidence that proves that this arrest warrant for these charges is legitimate. And Venezuela Interpol did not respond. That's another instance. If they had goods, they would have provided them to Interpol. They would have provided them to the Costa Rican authorities. They didn't. And as a result, the red notices were lifted. Is that in the record? It is in the record, yes. It's part of the response to the motion to dismiss. The two companies in Costa Rica got political asylum. They got refugee status. Julio got asylum here. The only reason why the appellant didn't get asylum is because she's Italian. She's not Venezuelan. She would have never qualified for asylum. Otherwise, she would have filed and probably get it. So that's all of evidence. We have two foreign sovereigns, Interpol and a really independent tribunal in Costa Rica. Costa Rica is a highly respected democratic nation, perhaps the most developed in Central America. But to look at these cases and the facts carefully and found a decision. We didn't... Attorney V6 Venezuela produced had no information about anything. It was a lawyer from the Guaidó administration residing in Colombia. She testified she was a prosecutor for corruption and she had to leave the country because she was investigating President Maduro for corruption. Judge Williams didn't allow to depose Attorney V6 of PECIDEN or IPSL, which we allege is the alter ego. We requested documents for the criminal file and other things. We didn't get anything, anything at all. And I think this court... However, if it reverses under any ground, the court must address those issues because if the case goes back, we're going to have those issues again. We're going to ask for a case and we're not going to get it. And lastly, we need to really use the court's authority to remind a different district judge. We've been going at it for 10 years. We asked the first time. We didn't get it. My client doesn't think he's going to get an impartial. There is no jury trial in this case. I kindly ask that we get our refund into a different district judge under your authority. Thank you. Thank you, Mr. De Silva. Thank you, counsel. The court will be in recess for 15 minutes. All right.